**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LESHUN SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-8884 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| RONALD BAUDINO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

LeShun Smith, an inmate at Stateville Correctional Center, enrolled in the Northwestern Prison Education Program ("NPEP"). While a student in the program, Smith learned that some of his classmates had sent harassing letters to the program's female instructors.

That behavior didn't sit well with Smith, so he decided to take action. He had a series of conversations with other inmates, both in person and over the phone, about the need to keep the classroom respectful. He planned to verbally confront those responsible.

The harassment of the teachers caught the attention of the prison officials, and they started investigating. Along the way, Correctional Officer Ronald Baudino listened to Smith's phone calls. Based on those calls, Officer Baudino believed that Smith and others were trying to band together to discipline the wrongdoers.

Officer Baudino charged Smith with violating Department Rule 205, which prohibits unauthorized group activities. The prison's disciplinary committee later presided over a hearing, and found Smith guilty not only of violating Rule 205, but also Rule 111, which prohibits assuming any leadership position in an unauthorized organization. Apparently, prison officials believed he was the ringleader.

Smith received a punishment of solitary confinement and a loss of several privileges. And perhaps worst of all, the sanction included a transfer to another institution that did not offer NPEP classes.

Smith responded by suing Baudino, the members of the disciplinary committee, the Warden, and the Director of the Illinois Department of Corrections ("IDOC"). He brings three claims, alleging a violation of his right to free speech and due process.

Defendants moved to dismiss for failure to state a claim. Latoya Hughes, the Director of the IDOC, also moved to dismiss for lack of jurisdiction.

For the reasons discussed below, the Court grants the motion to dismiss for failure to state a claim. The motion to dismiss for lack of jurisdiction is denied as moot.

**Background**

Northwestern University is the only top school in the country that offers prisoners the opportunity to earn a bachelor's degree. *See* Am. Compl., at ¶ 16 (Dckt. No. 36). Through the NPEP, the university offers a full range of courses to incarcerated students, subject to the same academic standards and requirements as students on its Evanston campus. *Id.* at ¶ 18.

LeShun Smith applied to the NPEP when he was an inmate at Danville Correctional Center. *Id.* at ¶ 25. Danville did not offer classes. So, when Smith was admitted in 2019, he voluntarily agreed to transfer to Stateville Correctional Center, a maximum security prison that does host the program. *Id.* at ¶ 26.

Smith made progress during the program. He earned over 100 credits toward his degree and was on track to graduate in 2024. *Id.* at ¶ 27.

He didn't graduate. In the Fall of 2022, all students in the NPEP were admonished for inappropriate letters sent to female tutors and volunteers. *Id.* at ¶ 29. Smith did not send any of these letters. Quite the contrary, he was troubled by the behavior.

Smith was so troubled that he took matters into his own hands. Smith had "conversations with his classmates to ensure that none of the staff or volunteers were harassed or otherwise discouraged from continuing to support students housed at Stateville." *Id.* at ¶ 31. These conversations with other students consisted of "the need to observe proper decorum when interacting with the Northwestern staff and volunteers." *Id.* at ¶ 32.

Smith spoke with currently incarcerated classmates in person. *Id.* at ¶¶ 31–33. He also spoke with Broderick Hollins, a recently released former inmate and classmate, over the phone. *Id.*

During those conversations, Smith "expressed his concern that his peers were potentially making volunteers uncomfortable." *Id.* at ¶ 34. He discussed his "plan[]" to "verbally attempt to ensure that professors and tutors were treated with respect." *Id.* at ¶ 46.

But the plan never got off the ground. Smith never "in fact engaged in any such conversations about inappropriate behavior with specific classmates who were accused of wrongdoing." *Id.* at ¶ 35. He also "did not engage in any intimidation or threats of violence against any individual." *Id.* at ¶ 36.

Unbeknownst to Smith, Ronald Baudino, a correctional officer at Stateville, was investigating him and other inmates in connection with the incident. *See* Defs.' Mtn. to Dismiss, at 2 (Dckt. No. 40). As part of that investigation, Officer Baudino listened to Smith's phone calls with Hollins and interviewed confidential informants. *Id.*

Based on his findings, Officer Baudino issued Smith a Disciplinary Report in August 2023, alleging a violation of Department Rules 111[1] and 205. *See* Am. Compl., at ¶ 40 (Dckt. No. 36). Officer Baudino apparently suspected Smith of trying to start (and lead) a vigilante group to protect the instructors.

Groups in prison can pose a danger and create a threat to order. That's why "[o]rganizations of committed persons shall be permitted to be established only with the approval of [prison authorities]." *See* 20 Ill. Admin. Code § 450.20.

Non-approved organizations violate Department Rule 205. That rule appears in an appendix in a section of the Illinois Administrative Code that governs discipline and grievances in prisons. It covers arson, assault, bribery, contraband, and so on.

Read in its entirety, Rule 205 prohibits "[e]ngaging in security threat group or unauthorized organizational activities, meetings or criminal acts; displaying, wearing, possessing or using security threat group or unauthorized organizational insignia or materials; or giving security threat group or unauthorized organizational signs." *Id.* § 504 App'x A.

Rule 111 singles out unauthorized group *leaders*. It prohibits, in part, "[k]nowingly accepting or assuming any leadership position or a position of authority over other offenders in any security threat group or unauthorized organization." *Id.*

After receiving the Disciplinary Report, Smith requested to call 40 witnesses to testify at a hearing before the Adjustment Committee, the prison's disciplinary body. *See* Am. Compl., at ¶ 47 (Dckt. No. 36). He also submitted a handwritten statement setting forth his defense. *Id.* at ¶ 48.

The Committee held a hearing. Francis Milsap served as Committee Chairperson, and Eddie Smith Jr. was the second panel member. *Id.* at ¶ 50. Smith attended the hearing and disputed the charge. *Id.* at ¶ 49.

Smith takes issue with how the Committee handled the hearing. He alleges that the Committee refused, without explanation, to interview any of the witnesses or allow them to testify. *Id.* at ¶¶ 54–55.

Instead, a staff member named Joel Starkey interviewed 21 of the witnesses and submitted a written summary. *Id.* at ¶ 56. According to Smith, each witness confirmed that he had not engaged in any gang activity or intimidation, yet the Committee did not consider this exculpatory evidence. *Id.* at ¶¶ 57, 61.

Smith also complains that the Committee did not consider his handwritten statement, did not listen to the recorded phone calls that supposedly established his guilt, and did not call Officer Baudino to testify, depriving Smith of the opportunity to question him. *Id.* at ¶¶ 59, 61, 62, 70.

---

[1] The report actually charged Smith with violating Rule "211" regarding "Possession of Solicitation of Unauthorized Personal Information." This was later determined to be a typo.

At the end of the hearing, the Committee found Smith guilty of violating both rules. *Id.* at ¶ 67. It recommended punishment of two days in "B-Grade" (*i.e.*, restricted privileges), two months in segregation, a disciplinary transfer, one month of phone restrictions, two months of commissary restrictions, and six months of contact visit restrictions. *Id.* at ¶ 71. The warden accepted the recommendation and imposed each punishment. *Id.* at ¶ 72.

In November 2023, Smith was transferred to Lawrence Correctional Center. *Id.* at ¶ 73.

The transfer was a major setback for Smith's drive to complete the Northwestern degree program. *Id.* at ¶ 75. Lawrence does not host the NPEP. As a result, Smith was unenrolled from the NPEP. *Id.* ¶ 74. He remains at Lawrence and has not been re-enrolled to date. *Id.*

Smith responded by suing Baudino, Milsap, Smith Jr., and Truitt in their personal capacities. He brings three claims.

First, Smith alleges that Defendants denied him due process before finding him guilty of the disciplinary violation. Second, he brings a First Amendment retaliation claim, arguing that Stateville guards are hostile to NPEP students and that he was targeted for his affiliation with and support for the program. Third, Smith challenges Rule 205 as unconstitutionally vague and overbroad as applied to him.

Smith also sued Latoya Hughes, the Director of the IDOC, in her official capacity, seeking injunctive and declaratory relief.

Defendants moved to dismiss for failure to state a claim. Hughes also moved to dismiss for lack of jurisdiction. *See* Defs.' Mtn. to Dismiss (Dckt. No. 58).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

Smith brings three claims. This Court will reshuffle the order, and will consider the First Amendment claims before addressing the due process claim.

## I. First Amendment Retaliation (Count II)

One of the First Amendment claims is a retaliation claim. To survive a motion to dismiss, a plaintiff must allege that "(1) [he] engaged in activity protected by the First Amendment, (2) [he] suffered a deprivation that would be likely to deter First Amendment activity in the future, and (3) the First Amendment activity was 'at least a motivating factor' in the Defendant's decision to take the retaliatory action." *See 145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021) (citations omitted).

The Court begins (and, in this case, ends) with the first prong: whether Smith engaged in activity protected by the First Amendment.

By definition, and by design, prisoners lose all sorts of rights when they get incarcerated. The First Amendment is no exception. Prisoners do retain some rights under the First Amendment, but the remnant doesn't hold a candle to the rights of people in free society.

It is well-established that "prison inmates have limited first amendment rights." *See Koutnik v. Brown*, 456 F.3d 777, 783 (7th Cir. 2006); *see also Shaw v. Murphy*, 532 U.S. 223, 228 (2001) ("The constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large"). Inmate speech is protected only to the extent it is "consistent with legitimate penological interests." *Watkins v. Kasper*, 599 F.3d 791, 796 (7th Cir. 2010); *see also Whitfield v. Spiller*, 76 F.4th 698, 708 (7th Cir. 2023).

"[O]fficials have broad discretion to regulate prisoners' speech" to advance legitimate penological interests. *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). And courts must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Courts will uphold the enforcement of a regulation as long as there is a "valid, rational connection between [a] prison regulation and the legitimate government interest put forth to justify it." *See Turner*, 482 U.S. at 89.

The standard is deferential to prison officials, who must shoulder the heavy, unenviable task of managing a facility that poses a full spectrum of challenges. The Seventh Circuit has upheld speech restrictions even when the connection between the prison's stated interest and the prohibited conduct was admittedly "tenuous." *See, e.g.*, *Toston v. Thurmer*, 689 F.3d 828, 830–31 (7th Cir. 2012) (upholding seizure of the Black Panther Party's Ten-Point Program from an inmate's cell where prison officials viewed the material as potentially inciting violence); *Singer v. Raemisch*, 593 F.3d 529, 535–38 (7th Cir. 2010) (upholding a restriction on Dungeons & Dragons role-playing game where prison officials believed that it could foster gang behavior).

Rule 205 unquestionably serves a legitimate penological interest. "Rule 205 clearly involves a central tenet of any prison administration which requires above all else that security, order, and discipline be maintained in what is obviously a volatile and potentially dangerous environment." *See Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987); *see also Bell v. Wolfish*,

441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). And Rule 111 likewise serves those interests by prohibiting leadership in gangs or other unauthorized groups. The two go hand in hand to preserve order.

If anything, preserving order and maintaining security for everyone is *the* penological interest. Everything else depends on it. A prison can't run without it.

By prohibiting unauthorized groups, the rules protect against a laundry list of problems. Inmates could form groups to intimidate each other. Rival factions could emerge. Tensions between rivals could erupt into conflict. A riot could break out. People could get hurt. And the list goes on.

The prison officials had a legitimate basis to conclude that Smith's conduct violated the rules and posed a threat to the community. Smith's complaint admits that he communicated with other inmates and was "planning to verbally attempt to ensure that professors and tutors were treated with respect." *See* Am. Compl., at ¶ 46 (Dckt. No. 36). And he admits to saying that "if he learned that another prisoner was acting inappropriately, he would be glad to talk to that student about why such conduct was detrimental." *Id.* at ¶ 34.

Prison officials could reasonably interpret that conduct as Smith and other inmates banding together to reprimand the wrongdoers. It's not hard to see how coordinating a potential face-to-face confrontation – involving multiple inmates who were already unhappy with each other – could quickly escalate into chaos. *See Watkins*, 599 F.3d at 798–99 (explaining that "confrontational" speech conflicts with prison's interest in maintaining order).

Smith might disagree that his conduct amounted to an "unauthorized group activity" within the meaning of Rule 205. But on "disputed matters of professional judgment," Supreme Court precedent "mandates deference to the view of prison authorities." *See Singer*, 593 F.3d at 534. Indeed, "the heightened volatility inherent in direct person-to-person interaction only serves to *increase* the discretion afforded prison administrators." *Rios*, 812 F.2d at 1037 (emphasis added).

To be sure, maybe Smith had a laudable goal and the best of intentions. And maybe everything would have gone smoothly if prison officials had not stepped in. But there was no guarantee that organizing a group to confront other inmates about their misbehavior wouldn't lead to trouble. Prison officials had no obligation to sit back, roll the dice, and see what happens.

Prison authorities determined that Smith's conduct was inconsistent with legitimate penological interests. That judgment call was within the field of play. The Court will not second-guess that decision. Smith's speech was not protected under the First Amendment, so he cannot state a retaliation claim. Count II is dismissed.

## II. First Amendment Vagueness and Overbreadth (Count III)

Next, Smith brings an as-applied First Amendment vagueness and overbreadth challenge to Rules 111 and 205. That claim fails, for similar reasons.

Restrictions on speech are impermissibly vague when "persons of common intelligence" must "guess at a phrase's meaning" and would disagree on its enforcement. *See Int'l Soc. for Krishna Consciousness v. Rochford*, 585 F.2d 263, 268 (7th Cir. 1978). They are overbroad when they "punish[] a 'substantial' amount of protected free speech." *See Walker v. McCaughtry*, 141 F. App'x 460, 462 (7th Cir. 2005) (citing *Virginia v. Hicks*, 539 U.S. 113, 118–20 (2003)). "Vague rules are overbroad because their scope is uncertain and because they tend to produce large chilling effects." *See Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023).

"But the concepts of overbreadth and vagueness in the jurisprudence of the First Amendment were devised in order to prevent the slightest discouragement of free speech and therefore have only limited relevance to a sphere where the right of free speech is limited," such as prisons. *See Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986); *see also Borzych v. Frank*, 439 F.3d 388, 391–92 (7th Cir. 2006) ("Whatever scope overbreadth analysis has in criminal prosecutions . . . it has little or none in civil litigation dealing with prisons' internal operations."); *McClain v. Leisure*, 192 F. App'x 544, 549 (7th Cir. 2006) ("To the extent that McClain challenges the policy as overbroad, his argument is unavailing given the encroachment permitted on a prisoner's First Amendment rights.").

"This limitation on the overbreadth doctrine grows out of the inherent restrictions on the rights of prisoners and the concomitant special need of prison administrators for flexible regulations." *Koutnik v. Brown*, 456 F.3d 777, 782 (7th Cir. 2006). "Some open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Borzych*, 439 F.3d at 392.

Prison regulations must account for all sorts of unpredictable scenarios, and they can only do so if there is some room for interpretation. *See*, *e.g.*, *Ustrak*, 781 F.2d at 580 (acknowledging that the regulation was "somewhat vague and overbroad," but nonetheless sufficient to survive a First Amendment challenge in the prison context).

By necessity, rules that regulate the conduct of prisoners must speak in general terms and paint in broad strokes. They need to apply to all sorts of potential factual scenarios. Pinning down the exact situation covered by each rule would stretch the imagination of prison officials. And it would lead to a prolix code that is too long for anyone to read and understand. *See Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 324 (2010) ("Prolix laws chill speech for the same reason that vague laws chill speech . . . .").

Smith alleges that "[n]othing in Rule 205 remotely provided [him] with notice" that "planning to verbally attempt to ensure that professors and tutors were treated with respect violated the rule." *See* Am. Compl., at ¶ 46.

Rule 205 provided sufficient notice that organizing a group of inmates to confront other students could constitute an unauthorized organizational activity. And Rule 111 provided

sufficient notice that leading the charge to organize was bad news. Although the rules do not specifically identify every type of conduct that might fall within the prohibition, a person of ordinary intelligence could reasonably understand that coordinating with other inmates to confront or otherwise act collectively toward individuals inside the prison could violate the rule.

Smith alleges that he spoke with other inmates and was "planning to verbally attempt to ensure" that everyone treated professors and tutors with respect. That's a group activity. And Rule 205 gave adequate notice about the ban on unauthorized group activities.

Admittedly, Rule 205 speaks in general terms, but that's not problematic. Again, "[s]ome open-ended quality is essential if a prison is to have any guidelines." *Borzych*, 439 F.3d at 392. Prison regulations must account for all sorts of unpredictable scenarios, and they can only do so if there is some room for interpretation.

Smith relies heavily on a Seventh Circuit case that addressed Rule 205, but he puts too much weight on it. *See Rios v. Lane*, 812 F.2d 1032 (7th Cir. 1987). In *Rios*, a plaintiff received disciplinary sanctions for violating Rule 205 when he passed a notecard to another inmate associated with a gang. *Id.* at 1034–35.

The notecard contained the broadcast times and frequencies of Spanish-speaking radio programs. *Id*. It also contained patriotic Puerto Rican slogans. *Id.* And importantly, the content of the notecard came from a newspaper called *The Militant*, "a publication explicitly authorized by prison officials." *Id.* at 1038.

The Seventh Circuit held that Rule 205 was vague as applied to that conduct. Rios had no way to know that passing along the content of an approved publication could lead to sanctions. "It could hardly be anticipated that the simple transcription of previously authorized information onto a note card would somehow cast its scrivener upon Jonah's leviathanian voyage." *Id.*

The rule spoke in broad strokes, and it didn't give Rios notice that it prohibited passing along approved material. "[A]side from the sparse text of the Rule itself, no material whatsoever was available to Rios describing what conduct was prohibited by the Rule." *Id.*

*Rios* doesn't lend a helping hand to Smith. For starters, it required mental gymnastics to connect the plaintiff's conduct in *Rios* to gang activity. Helping a recently-transferred inmate find radio stations – and passing along prison-approved content – does not seem like group activity.

That conduct is a far cry from the facts here, which involved communicating with other inmates about the need to discipline wrongdoers. Smith alleges that he communicated with other inmates to "plan[]" a response and enforce standards for civility. That's a group activity. And Rule 205 gave sufficient notice that group activities required approval.

What's more, *Rios* involved a due process claim, not a free speech claim. As the Seventh Circuit itself acknowledged, "Rios' due process claim is completely distinguishable from and not dependent upon any free speech considerations." *Id.* at 1039.

Because Rule 205 is sufficiently definite for purposes of the First Amendment, Smith has failed to state a vagueness and overbreadth claim.

## III. Due Process (Count I)

Finally, Smith brings a procedural due process claim under the Fourteenth Amendment. To state a due process claim, a plaintiff must allege (1) a constitutionally protected liberty or property interest, (2) a deprivation of that interest, and (3) a denial of due process. *See Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013).

Defendants have all sorts of due process rights during ongoing criminal cases. But the rules of the game change dramatically after a conviction. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *See Price v. Johnston*, 334 U.S. 266, 285 (1948). Incarceration inherently involves a loss of liberty, so prisoners have limited liberty interests under the Due Process Clause. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983) ("[We] have consistently refused to recognize more than the most basic liberty interests in prisoners.").

Smith's due process claim goes nowhere fast because he has not alleged a constitutionally protected liberty or property interest. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.").

Smith identifies three possible interests: (1) a liberty interest in "remaining free from solitary confinement;" (2) a property interest in continued access to education through the NPEP; and (3) a liberty interest in exercising his First Amendment right to free speech. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 8-11 (Dckt. No. 42). The Court considers each in turn.

### A. Liberty Interest in Remaining Free from Solitary Confinement

To begin, Smith does not have a protected interest in remaining free from solitary confinement.

Prisoners rarely have a liberty interest when it comes to the conditions of confinement. "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *See Montanye v. Haymes*, 427 U.S. 236, 242 (1976).

In egregious circumstances, a disciplinary sanction can create a protected liberty interest where none would otherwise exist. But the interest is "generally limited to freedom from restraint . . . [that] imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 483–84 (1995).

Whether a disciplinary sanction imposes an "atypical and significant hardship" depends on the "combined import of the duration of the segregative confinement and the conditions

endured." *See Ealy v. Watson*, 109 F.4th 958, 964 (7th Cir. 2024) (quoting *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013)). Basically, courts must ask how bad it was, and how long it lasted.

Here, it is unclear from the face of the complaint exactly how long Smith spent in solitary confinement. But he was sentenced to two months. That stretch of time would undoubtedly feel long for the person serving the time alone. Even so, it's not long enough to give rise to a liberty interest.

The Seventh Circuit has held that substantially longer periods of time in segregation did not give rise to a liberty interest. *See, e.g.*, *Singh v. Gegare*, 651 F. App'x 551, 555 (7th Cir. 2016) (no liberty interest in avoiding 105 days in punitive segregation); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (six months in segregation, standing alone, was "not such an extreme term" as to trigger due process rights); *Hardaway*, 734 F.3d at 744 (no liberty interest in avoiding six months of segregation with a steel cell door, limited shower and yard access, and a confrontational cellmate).

Smith argues that the conditions in Stateville solitary were deplorable and gave rise to a protected liberty interest. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 9-10 (Dckt. No. 42). As Smith points out, "[f]ewer than six months in segregation may still establish a liberty interest 'depending on the conditions of confinement.'" *Ealy*, 109 F.4th at 964 (citing *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015)).[2]

But the bar is high. The Seventh Circuit has "repeatedly determined that even extremely harsh prison conditions may not be so 'atypical' as to create [a] liberty interest." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). Smith does not allege any specific condition or treatment he received in solitary that gets him across this threshold.

Smith also points to the "additional punishments" that he received as evidence of a protected liberty interest, including "a disciplinary transfer out of Stateville and an indefinite suspension from academic programming." *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss at 10 (Dckt. No. 42). Those sanctions do not change the analysis.

A disciplinary transfer and the loss of prison privileges, even when combined with a period of segregation, do not impose an atypical and significant hardship. *See, e.g., Hoskins v. Lenear*, 395 F.3d 372, 374–75 (7th Cir. 2005) (finding "no due process concerns" with "a demotion to C-grade (a loss in privileges), two months in segregation, and . . . transfer [to another correctional facility]"); *Higgason v. Farley*, 83 F.3d 807, 809 (7th Cir. 1996) (holding that denial of access to various prison privileges, including social and rehabilitative activities, "simply do[es] not impose 'atypical and significant hardship'" on the prisoner).

For those reasons, Smith fails to state a claim based on a liberty interest in avoiding solitary confinement.

---

[2] Smith didn't raise this allegation in the complaint. Even so, the Court will consider it. It's a legal theory, and a complaint doesn't have to allege legal theories.

### B. Property Interest in NPEP Enrollment

Smith next argues that his participation in NPEP is akin to an "educational scholarship" giving rise to a protected property interest. His theory appears to be that, because Northwestern's tuition costs some $80,000 per year and he received the education at no cost, that benefit constitutes his property.

The mere fact that an educational benefit has monetary value does not automatically make continued access to the program "property" for purposes of the Due Process Clause. *See Charleston v. Bd. of Trs. of Univ. of Ill. at Chi*., 741 F.3d 769, 772 (7th Cir. 2013) (explaining that the Seventh Circuit has "rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education"); *see also Doe v. Purdue University*, 928 F.3d 652, 659 (7th Cir. 2019) ("A college education – any education – is not property in the usual sense of the word.").

To have a property interest protected by the Fourteenth Amendment, a plaintiff must have "more than a unilateral expectation of [the claimed interest]. He must, instead, have a legitimate claim of entitlement to it." *See Santana v. Cook Cnty. Bd. of Rev*., 679 F.3d 614, 621 (7th Cir. 2012) (alteration in original). That entitlement must come from "some independent source such as state law." *See Beischel v. Stone Bank Sch. Dist.,* 362 F.3d 430, 435 (7th Cir. 2004).

Smith does not point to any such source. He does not allege that Northwestern, the prison, or any Defendant promised that he could complete NPEP, let alone that he had a right to complete the program. He does not point to any statute or regulation that guaranteed access to the program. He does not point to any contractual right, either.

Participation in the program did not have any of the hallmarks of a property interest. Smith couldn't buy it. He couldn't sell it. He couldn't transfer it. He couldn't encumber it. He couldn't assert a right to exclusivity. He can't point to any law that created an entitlement to it.

Even a contractual right wouldn't do Smith much good. Prisons have an interest in law and order, and maintaining security within the facility is job one. Incarceration necessarily leads to a loss of liberty for inmates, on all sorts of levels. One of the many examples is a loss of the ability to enter into contracts like members of free society. Inmates cannot enter into whatever contracts they want, and expect prisons to adjust accordingly.

What's more, the Seventh Circuit has already rejected arguments nearly identical to the argument made by Smith. An inmate does not have a protected liberty interest in educational programming. *See, e.g., Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000) (inmate had no protected interest in continued access to educational and rehabilitation programs after being transferred to a prison that did not offer them); *Higgason*, 83 F.3d at 809 (denial of access to educational programs does not infringe on a protected interest); *see also Garza v. Miller*, 688 F.2d 480, 486 (7th Cir. 1982) ("There is no constitutional mandate to provide educational, rehabilitative, or vocational programs, in the absence of conditions that give rise to a violation of the Eighth Amendment.").

For those reasons, Smith did not have a property interest in completing the educational program.

### C. Liberty Interest in Free Speech

Smith's last theory is that he has a liberty interest in free speech under the First Amendment.

At first glance, this argument may seem strange. After all, Smith invokes the *First* Amendment to plead a violation of the *Fourteenth* Amendment. But the Supreme Court and Seventh Circuit have recognized that an interest grounded in the First Amendment may *also* constitute a protected liberty interest for purposes of procedural due process. *See Procunier v. Martinez*, 416 U.S. 396, 418 (1974) (holding that freedom of speech "is plainly a liberty interest within the meaning of the Fourteenth Amendment"); *see also Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983) ("Freedom of speech is one of the liberties the due process clause has been held to protect."); *Miller v. Downey*, 915 F.3d 460, 466 (7th Cir. 2019) ("The imperative of fair process may take on added significance in the domain of free speech."). If an inmate has a right to free speech, the prison can't take it away without due process.

Even so, a due process claim about free speech requires a showing that the First Amendment protects the speech in the first place. A plaintiff cannot transform unprotected speech into a protected liberty interest simply by wrapping a free speech claim in due process packaging. *See, e.g.*, *Jackson v. City of Columbu*s, 194 F.3d 737, 749 (6th Cir. 1999) ("Because we find that Jackson has stated a claim for a violation of his First Amendment right of freedom of speech . . . we hold that he has sufficiently alleged the deprivation of a liberty interest.").

This Court has already determined that Smith does not have a free speech claim under the First Amendment. So the speech cannot give rise to a liberty interest under the Due Process Clause, either.

To sum it all up, the complaint does not allege that Smith had a protected interest, so he has no due process claim.[3]

## Conclusion

For the foregoing reasons, this Court grants Defendants' motion to dismiss for failure to state a claim. The motion to dismiss for lack of jurisdiction is denied as moot.

[3] Defendants raised other arguments, too, such as standing and qualified immunity. This Court doesn't need to reach them, given that the complaint is dismissed on other grounds.

Date: September 10, 2026

Steven C. Seeger
United States District Judge